In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-1693

SHERRY ANICICH,

*Plaintiff-Appellant,*

*v.*

HOME DEPOT U.S.A., INC., *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14 C 7125 — **Jorge L. Alonso**, *Judge.*

ARGUED JANUARY 10, 2017 — DECIDED MARCH 24, 2017

Before WOOD, *Chief Judge*, and ROVNER and HAMILTON,
*Circuit Judges.*

HAMILTON, *Circuit Judge*. This tragic case tests the scope of
Illinois employers' tort liability for intentional torts commit-
ted by their supervisory employees against other employees
where the employer has been negligent. Plaintiff's complaint
alleges that the defendants jointly employed as a supervisor a
man with a known history of sexually harassing, verbally
abusing, and physically intimidating his female subordinates.

The complaint also alleges that the joint employers failed to take reasonable steps in response to female employees' complaints and to misbehavior that more senior managers observed.

The supervisor's treatment of one subordinate, Alisha Bromfield, included verbally abusing her while throwing things, controlling and monitoring her both during and outside her work hours, and requiring her to come with him on business trips. After five years of that treatment, he used his supervisory authority to require Alisha to come on a personal trip with him—to an out-of-state family wedding—by threatening to fire her or cut her hours if she refused. She went. After the wedding, he killed and raped her.

Alisha's mother, acting as the administrator of the estates of Alisha and Alisha's unborn daughter, has sued the employers. The defendant-employers persuaded the district court that they had no duty to control this supervisor's behavior. We respectfully disagree. Illinois law permits recovery from employers whose negligent hiring, supervision, or retention of their employees causes injury. The unusually detailed complaint plausibly states such claims. We believe the Illinois courts would apply this general principle to the claims arising from Alisha's murder.

I.  *Factual and Procedural Background*

The defendant-employers moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. By that strategic choice, they have asked us to treat the allegations in the complaint as true and to give the plaintiff the benefit of any reasonable and favorable inferences from those allegations. *Reynolds v. CB*

*Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010). In its general outline, the complaint's story is all too familiar: defendants employed as a supervisor a man with a history of sexually harassing his young female subordinates. He fixated on one. He began making advances on her and calling her his girlfriend. His behavior escalated over time, from such inappropriate comments to verbal abuse, public outbursts, throwing and slamming objects, and finally, to deadly violence.

In its specifics, the complaint's story is tragic, ending in the deaths of Alisha and her unborn daughter at the hands of Brian Cooper, a regional manager for the defendant-employers. The three defendants are Home Depot U.S.A., Inc., Grand Service, LLC, and Grand Flower Growers, Inc., which managed garden centers for Home Depot stores. Am. Compl. ¶ 9. All three defendants jointly employed Brian Cooper as a regional manager. ¶ 11.[1]

Cooper had a history of sexually harassing his young female subordinates. He fixated for a while on a recent high school graduate named Jessica. ¶ 18. He would introduce her as his girlfriend, make comments about his genitals to her, and rub himself against her. ¶ 19. He once required her to ride alone with him from Joliet to Chicago while he made such comments. ¶ 20. Jessica complained to her group leader, who told her that other employees had complained about Cooper and that even the group leader herself felt uncomfortable working with him. ¶ 21. Cooper became increasingly loud

---

[1] The complaint does not explain the relationship between Grand Service and Grand Flower, but they appear to be part of the same corporate structure. We refer to the two companies collectively as "Grand." The issue of joint employment was not part of the defendants' motions to dismiss or the district court's decision and is beyond the scope of this appeal.

and abusive with Jessica, yelling and swearing at her. ¶ 22. Ultimately, Jessica quit her job. ¶ 23.

Cooper then shifted his attention to Alisha Bromfield. Alisha was a teenager when she began working for the defendants in 2006, and she worked seasonally for them until her death in 2012. ¶ 14. Cooper's behavior toward her at first resembled his behavior towards Jessica. He would call her his girlfriend. ¶ 27. He started swearing and yelling at her, calling her names like "bitch," "slut," and "whore" in front of customers. ¶¶ 26, 34. These outbursts came to include throwing and slamming things. ¶ 39.

Cooper became increasingly controlling of Alisha's time away from work. If she was going to spend a lunch break with a man, he sometimes denied her lunch breaks. ¶ 33. Once, when she asked him for a day off, he called her a "whore." ¶ 34. He started calling and texting her outside of work, pretending he wanted to talk about a work-related issue in order to get her attention, to monitor her, and to pressure her to spend time with him alone. ¶ 38. And he required Alisha to come with him on business trips, once insisting that they share a hotel room. ¶ 46. In her last year working for the defendants, and the last year of her life, Alisha became pregnant. Cooper reacted angrily. ¶ 36.

Cooper's behavior toward female subordinates in general and Alisha in particular was known to more senior management. Throughout her time working for the defendants, Alisha complained repeatedly about Cooper to other supervisors and managers in the defendants' hierarchies. ¶ 37. She told her group leader that she did not want to be left alone with him. ¶ 27. One Home Depot manager saw Alisha crying after Cooper denied her a break. ¶ 33. Another sent Cooper home

after he called Alisha a "slut" and a "whore" in front of cus-
tomers. ¶ 35. Grand ordered him to take anger management
classes, but he did not complete the course. He confronted his
human resources manager about the requirement, and was
ordered to attend additional anger management classes, but
neither employer followed up to make sure he did so. ¶ 42.
Defendants' managers told Alisha that they knew about
Cooper's behavior. ¶ 39. Yet he remained Alisha's supervisor.
¶ 30.

In 2012, when Alisha was about seven months pregnant,
Cooper began asking her to go to his sister's wedding in Wis-
consin with him. ¶¶ 49, 51. She refused. Then, invoking the
authority the defendants had entrusted to him as a supervi-
sor, he told her he would fire her or reduce her hours if she
did not go. ¶¶ 49–50. She went. After the wedding, Cooper
took Alisha to the hotel room he had rented for the two of
them. He asked her, again, to be in a relationship with him.
She refused, again. ¶ 53. Cooper strangled her to death. He
then raped her corpse.[2]

Plaintiff Sherry Anicich is Alisha Bromfield's mother. She
is the administrator of the estates of both Alisha and her un-
born daughter. ¶¶ 1, 93. In her capacity as administrator, An-
icich sued Home Depot and Grand in state court in Illinois.
Defendants removed the case to federal court based on diver-
sity jurisdiction under 28 U.S.C. §§ 1332 and 1441.

The defendants then moved to dismiss the complaint un-
der Rule 12(b)(6) for failure to state a claim. The district court

---

[2] Cooper was found guilty of first-degree intentional homicide and third-
degree sexual assault. He was sentenced to two consecutive life terms
without the possibility of parole.

granted the original motions but correctly gave the plaintiff leave to amend. See, e.g., *Runnion v. Girl Scouts of Greater Chicago*, 786 F.3d 510, 519 (7th Cir. 2015) (where Rule 12(b)(6) motion is granted, plaintiff should ordinarily be given at least one opportunity to amend complaint), citing *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1024 (7th Cir. 2013), among other cases. The plaintiff filed her amended complaint, which we use for our account of the facts. The amended complaint alleges the defendants were negligent and that their negligence caused Alisha's death at Cooper's hands. The defendants again moved to dismiss on the ground that they did not owe a duty of care to Alisha. The district court agreed and dismissed the complaint, again granting leave to amend. *Anicich v. Home Depot, U.S.A., Inc.*, No. 14 C 7125, 2016 WL 930655, at *5 (N.D. Ill. Mar. 11, 2016). The plaintiff chose to appeal, without trying to amend further.[3]

II. *Analysis*

We review *de novo* the district court's decision to dismiss, "construe [the complaint] in the light most favorable to the nonmoving party, accept well-pleaded facts as true, and draw all inferences in [that party's] favor." *Reynolds*, 623 F.3d at 1146, quoting *Reger Development, LLC v. National City Bank*, 592

---

[3] Grand argues that we lack appellate jurisdiction because plaintiff filed her notice of appeal before the district court entered its final judgment of dismissal with prejudice. The argument overlooks Federal Rule of Appellate Procedure 4(a)(2), which provides that a notice of appeal filed "after the court announces a decision … but before the entry of the judgment" is treated as "filed on the date of and after the entry." See also *Albiero v. City of Kankakee*, 122 F.3d 417, 420 (7th Cir. 1997) (applying that rule to a notice of appeal filed before time to file a new complaint expired). We have jurisdiction over this appeal.

F.3d 759, 763 (7th Cir. 2010). Applying that standard, we reverse.

Illinois tort law controls this case. See *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938). There is no Illinois case directly on point, but there are a number of indications from related situations involving attempts to hold employers liable for a wide range of torts committed by their employees. Our task as a federal court interpreting state law is "to determine how the state's highest court would rule." *Rodas v. Seidlin*, 656 F.3d 610, 626 (7th Cir. 2011). We base our predictions on the decisions of the state's highest court, and we consider decisions of intermediate appellate courts unless there is good reason to doubt the state's highest court would agree with them. *Id.*

The general rule in Illinois tort law is that one person has no duty to prevent the criminal acts of another. *Simmons v. Homatas*, 925 N.E.2d 1089, 1099 (Ill. 2010). But Illinois courts recognize several exceptions that limit the general rule. We focus on one: employers have a duty to act reasonably in hiring, supervising, and retaining their employees. *Van Horne v. Muller*, 705 N.E.2d 898, 904 (Ill. 1998) ("Illinois law recognizes a cause of action against an employer for negligently hiring, or retaining in its employment, an employee it knew, or should have known, was unfit for the job so as to create a danger of harm to third persons."); *Platson v. NSM, America, Inc.*, 748 N.E.2d 1278, 1284 (Ill. App. 2001) ("[P]laintiff has alleged sufficient facts to establish a possibility of recovery for negligent supervision.").

To recover for a breach of that duty, a plaintiff must prove that: (1) the defendant-employer knew or should have known that an employee had a particular unfitness for his position so

as to create a danger of harm to third persons; (2) that such particular unfitness was known or should have been known at the time of the hiring, retention, or failure to supervise; and (3) that this particular unfitness proximately caused the plaintiff's injury. *Van Horne*, 705 N.E.2d at 904; *Platson*, 748 N.E.2d at 1284. The proximate causation element is satisfied when the employee's particular unfitness "rendered the plaintiff's injury foreseeable to a person of ordinary prudence in the employer's position." *Platson*, 748 N.E.2d at 1284.

Home Depot and Grand offer three reasons why the plaintiff did not state a claim under that theory. First, they believe that allowing this case to go forward would extend Illinois law and that such an extension would create new and unjustifiable burdens for employers. See *Simpkins v. CSX Transportation, Inc.*, 965 N.E.2d 1092, 1098 (Ill. 2012) ("the magnitude of the burden of guarding against the injury" is one factor in whether a duty existed). Second, they argue that those rules apply only when the employee is on the employer's premises or using the employer's chattel, and that neither was true when Cooper killed Alisha. See Restatement (Second) of Torts § 317(a) (Am. Law Inst. 1965); *O'Rourke v. McIlvaine*, 19 N.E.3d 714, 721–22 (Ill. App. 2014) (applying § 317 to a negligent hiring and retention claim). Finally, they contend that Alisha's injury was not foreseeable to a person of ordinary prudence in the employer's position. We address those concerns in turn.

A. *Burden of the Duty*

Defendants believe that they have no obligation to fire or demote employees because of their "usage of inappropriate

language, or sexual misconduct."[4] We should not create that obligation, they argue, because the resulting burdens would be intolerable.

The problem with that argument is that the defendants already have that obligation, independent of this case and even independent of Illinois tort law. "Hostile or abusive work environments are forms of sex discrimination actionable under Title VII of the Civil Rights Act of 1964." *Lapka v. Chertoff*, 517 F.3d 974, 982 (7th Cir. 2008). Sexual harassment is also actionable under the Illinois Human Rights Act. 775 Ill. Comp. Stat. 5/2-102(D); *Sangamon County Sheriff's Dep't v. Illinois Human Rights Comm'n*, 908 N.E.2d 39, 41 (Ill. 2009).

Under these statutes, employers can be held liable for failing to discipline harassing employees. See *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) (employers are vicariously liable for hostile environments created by supervisors unless they can show they "exercised reasonable care to prevent and correct promptly any sexually harassing behavior"); *EEOC v. Management Hospitality of Racine, Inc.*, 666 F.3d 422, 434–35 (7th Cir. 2012) (affirming jury verdict for plaintiff, in part because there was sufficient evidence to find that defendants' sexual harassment policy did not prevent and promptly correct harassment); *Smith v. Sheahan*, 189 F.3d 529,

---

[4] Home Depot asserts in its brief that it employs "thousands" of such people. We hope this insult to the character of Home Depot's employees and to the judgment of its managers was just an ill-advised exaggeration. For its part, Grand frames the case in terms of whether it had an obligation to control *Alisha's* behavior. This offensive assumption that the victim's behavior was the problem is at best flatly contrary to the Rule 12(b)(6) standard.

535 (7th Cir. 1999) (reasonable jury could conclude that de-
fendant did not remedy harassment when it failed to disci-
pline harasser); *Mansker*, No. 1999SF0356, 2004 WL 3372598,
at *2 (Ill. Hum. Rts. Comm'n Apr. 7, 2004) (finding employer
liable when it had notice of sexual harassment and "did not
take actions to correct the working environment"); see also
*Heath*, No. 2003CF1052, 2004 WL 4229510, at *1 (IL Dep't
Hum. Rts. Aug. 1, 2004) (dismissing in part a charge of dis-
crimination because the employer investigated, suspended,
and finally discharged the harassing co-worker). The plaintiff
does not ask us to impose any new obligations on employers
to oversee their supervisory employees, and we do not do so
by allowing this case to proceed.

B.  *On the Employer's Premises*

The Restatement (Second) of Torts provides that employ-
ers have "a duty to exercise reasonable care" to control em-
ployees who are acting outside the scope of their employment
if the employees are on the employers' premises or using the
employers' chattels. Restatement (Second) of Torts § 317(a)
(Am. Law Inst. 1965). (As examples of chattels that could be
used in such torts, consider motor vehicles, power tools, or
weapons.)

Illinois has adopted that rule and has used it to limit em-
ployers' liability for negligent hiring, supervision, or reten-
tion. See *O'Rourke*, 19 N.E.3d at 721, citing *Hills v. Bridgeview
Little League Ass'n*, 745 N.E.2d 1166, 1179 (Ill. 2000); *Escobar v.
Madsen Construction Co.*, 589 N.E.2d 638, 639–40 (Ill. App.
1992) (explaining that cases holding employers liable for neg-
ligent hiring and supervision "fall within the purview" of
§ 317). The requirement is intended not to be arbitrary or for-
malistic but to limit recovery to injuries which "occurred by

virtue of the servant's employment." *Doe v. Boy Scouts of America*, 4 N.E.3d 550, 561 (Ill. App. 2014), quoting *Carter v. Skokie Valley Detective Agency, Ltd.*, 628 N.E.2d 602, 604 (1993).

In particular, Illinois applies this rule to avoid holding an employer liable simply because the tortfeasor and the victim know each other through work. See *MacDonald v. Hinton*, 836 N.E.2d 893, 901–02 (Ill. App. 2005) (premises requirement not met where murderer befriended victim through work); see also *Carter*, 628 N.E.2d at 605–06 (murderer's negligent employment not the cause of victim's death, even though victim let him into her car because "she trusted him because she knew him from work"). In *Escobar*, for example, the defendant employed as a foreman a carpenter with a history of verbal abuse and violent confrontation, both on and off the defendant's worksites. 589 N.E.2d at 638. One night, the carpenter got into a fight with a co-worker in a bar; the next morning, he shot the co-worker. *Id.* at 638–39. The Illinois appellate court affirmed summary judgment for the employer, reasoning that the employment and the assault were not sufficiently connected. *Id.* at 639. The tortfeasor "was not on Madsen's job site, not doing Madsen's work, and not using Madsen's gun." *Id.* at 640. The employment only "provided a condition" for the attack. *Id.* at 639.

Cooper was not on the defendants' premises when he killed Alisha, nor did he use their chattels. But he used something else the defendants gave him: supervisory authority over Alisha. He threatened to fire her or reduce her hours if she did not go with him to his sister's wedding. Am. Compl. ¶¶ 49–50. He thus threatened to take what the Supreme Court calls "tangible employment actions." *Ellerth*, 524 U.S. at 761.

He could do that only because the defendants made him Ali-sha's supervisor. See *id.* at 762 ("Tangible employment actions fall within the special province of the supervisor.").

We believe that § 317(a) should be satisfied by a tortfea-sor's use of supervisory authority. We predict that the Illinois Supreme Court would agree, for two reasons: because super-visory authority is in this respect analogous to a chattel, and because other grounds support holding employers liable in tort for misuse of supervisory power.

### 1. *The Analogy Between Chattels and Authority*

We see no principled reason to hold employers liable for the tortious abuse of their chattels but not for the tortious abuse of supervisory authority. Defendants' argument asks us to predict that Illinois courts would treat entrustment with keys or with a truck as more serious than entrustment with control over others' livelihoods. Cf. *Carter*, 628 N.E.2d at 605 (claim for willful and wanton hiring supported where secu-rity guard used his passkey to enter plaintiff's apartment and assault her), discussing *Easley v. Apollo Detective Agency, Inc.*, 387 N.E.2d 1241, 1243 (Ill. App. 1979); *Malorney v. B & L Motor Freight, Inc.*, 496 N.E.2d 1086, 1088–89 (Ill. App. 1986) (ques-tion of fact for the jury existed in negligent hiring case, where employer equipped driver with truck in which he raped hitchhiker).

Formalistic adherence to the literal terms of § 317(a) would also produce odd, even arbitrary, results. In *Kigin v. Woodmen of the World Ins. Co.*, 541 N.E.2d 735, 737 (Ill. App. 1989), for example, an Illinois appellate court held that the plaintiff stated a claim against the operator of a youth camp for the actions of a camp counselor. The counselor, a 41-year-

old man, gave alcohol to a 15-year-old female camper, took her to a remote area of the campground, and sexually molested her. *Id.* at 736. The *Kigin* court noted that the attack took place on the defendant's premises, bringing it within the terms of § 317(a). *Id.* We think it unlikely that the result would have been different if the attacker had taken his victim across the property line of the campground. The employer knew that the counselor had gone "off into the woods at 11:30 at night alone with [a] 15-year-old girl[] after plying" her with alcohol. *Id.* at 737. The employer's obligation to act on that information surely does not change depending on whether the counselor crossed a property line when he took his victim away.

Both entrustment with a chattel and entrustment with supervisory authority set employees apart from the general public. Both can enable tortious conduct. In both situations, employers have the ability and incentive to consider and monitor the employees whom they are trusting and how that trust is used. Injuries caused by using a chattel and injuries caused by abusing supervisory authority both occur "by virtue of the [tortfeasor's] employment," and not because tortfeasor and victim merely know each other through their work. *Doe*, 4 N.E.3d at 561.

### 2. *Supervisory Authority as a Ground for Tort Liability*

Principals can often be held liable for the misuse of authority they delegate, whether or not they are negligent. Restatement (Second) of Agency § 219(2)(d) (Am. Law Inst. 1957) ("A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless … the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency

relation."). Such vicarious liability rules have traditionally been confined to cases where the employee acts within the scope of his employment or purports to act on the principal's behalf. See Restatement (Second) of Agency § 219 cmt. a (Am. Law Inst. 1957) ("The conception of the master's liability to third persons appears to be an outgrowth of the idea that within the time of service, the master can exercise control over the physical activities of the servant.").

But more recently, the law has moved toward holding employers vicariously liable for their supervisory employee's intentional torts committed *outside* the scope of their employment but by abusing their supervisory authority, subject to an affirmative defense. The shift can be seen in the Supreme Court's decision in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998). The issue was whether and how an employer can be vicariously liable under Title VII of the Civil Rights Act of 1964 for supervisors' sexual harassment of their subordinates. *Id.* at 754.

The Supreme Court answered those questions by applying the last clause of the Restatement (Second) of Agency § 219(2)(d), holding masters liable for their servants' torts when the servants are "aided in accomplishing the tort by the existence of the agency relation." *Id.* at 759–60. The Court explained that a supervisor is "beyond question" aided by the agency relation when he takes tangible employment action against a subordinate. *Id.* at 760. A tangible employment action is "a significant change in employment status," such as firing or reduced hours and compensation. *Id.* at 761, citing *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993) ("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a

decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."). If a supervisor takes tangible employment action against an employee, the employer is vicariously liable. *Id.* at 762–63.

But what if the supervisor only *threatens* to take tangible employment action but does not actually take it because the threat has worked? *Ellerth* answered that question by adopting a two-step holding: an employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with authority over the employee. However, if no tangible employment action is taken, an employer may raise an affirmative defense by proving both that the employer exercised reasonable care to prevent and corrected promptly any sexually harassing behavior, and that the employee unreasonably failed to take advantage of preventive or corrective opportunities provided by the employer or to avoid harm otherwise. 524 U.S. at 765.

*Ellerth* drew on general principles of agency and tort law to interpret a federal statute, Title VII. That development of the law was then made more general in the Restatement of Employment Law, which applies the *Ellerth* framework beyond the sexual harassment context to intentional torts committed "by the tortious abuse or threatened abuse of a supervisory or managerial employee's authority." Restatement of Employment Law §§ 4.03(c) & 4.06 (Am. Law Inst. 2015). Thus expanded to the more general tort and agency law that was itself the foundation of *Ellerth*, the *Ellerth* framework fits the facts alleged in the complaint here. Cooper's threats to fire

Alisha or cut her hours were exactly what the *Ellerth* court addressed: threats to take tangible employment actions that were not carried out, because the threat worked. Under the principles of the Restatement of Employment Law, Anicich would be able to pursue a claim under §§ 4.03 and 4.06.

There is good reason to think that the Illinois Supreme Court would adopt those principles. It has already adopted § 219 of the Restatement (Second) of Agency, which lies at the root of the *Ellerth* framework. See *Wright v. City of Danville*, 675 N.E.2d 110, 118 (Ill. 1996) (citing § 219). And that court often looks to the Restatements of the Law for advice and guidance. See *Hudson v. City of Chicago*, 889 N.E.2d 210, 216 (Ill. 2008) ("This court then adopted the exceptions to claim-splitting set forth in section 26(1) of the Restatement (Second) of Judgments (1982)."); *Olson v. Etheridge*, 686 N.E.2d 563, 569 (Ill. 1997) ("[W]e hereby adopt the vesting rule set forth in section 311 of the Second Restatement [of Contracts]."); *Cult Awareness Network v. Church of Scientology International*, 685 N.E.2d 1347, 1353 (Ill. 1997) ("We regard the Restatement [(Second) of Torts]'s treatment of the favorable termination requirement as more balanced than our appellate court's interpretation."). It might find the Restatement of Employment Law persuasive.

But we need not and do not hold here that the Illinois Supreme Court would adopt that framework. The *Ellerth* vicarious liability framework is harder on employers than Illinois's traditional negligent retention tort. For example, it places the burden on employers to show non-negligence rather than on plaintiffs to show negligence, and it applies whether or not the employer should have known that the supervisor was unfit for his position. We discuss it to show that our holding is

(1) part of a broader trend toward recognizing employer liability for supervisors' intentional torts committed outside the scope of employment; and (2) only an incremental shift, when there are good grounds to go much further. We confine ourselves to predicting that intentional torts committed by the abuse of a supervisory employee's authority satisfy the requirements of the Restatement (Second) of Torts § 317(a), and thus that Anicich's complaint states a claim for negligent hiring, supervision, or retention.

C. *Foreseeability*

To succeed on a claim for negligent hiring, supervision, or retention, the plaintiff must demonstrate that the employee's "particular unfitness … rendered the plaintiff's injury foreseeable to a person of ordinary prudence in the employer's position." *Van Horne*, 705 N.E.2d at 906. In this context, foreseeability is ordinarily a question of fact for a jury to decide. *Platson*, 748 N.E.2d at 1284, citing *Nowak v. Coghill*, 695 N.E.2d 532, 537 (1998).

Cooper's "particular unfitness" was his harassing, controlling, and aggressive behavior toward his female subordinates. Defendants suggest two reasons why Alisha's injuries were not foreseeable from that conduct. First, Cooper's violent attack on Alisha was a radical break from even his most offensive prior behavior: even if a reasonable employer could have foreseen violence, they argue, they could not have foreseen murder. Second, a reasonable employer could not have predicted violence at all since Cooper had not made explicit threats and had not yet hit anyone. We conclude that both arguments present factual issues that cannot be decided on a Rule 12(b)(6) motion to dismiss.

"In order to satisfy the foreseeability component, it is not necessary that a defendant must have foreseen the precise nature of the harm or the exact manner of occurrence; it is sufficient if, at the time of the defendant's action or inaction, some harm could have been reasonably foreseen." *Regions Bank v. Joyce Meyer Ministries, Inc.*, 15 N.E.3d 545, 552 (Ill. App. 2014); see also *Rowe v. State Bank of Lombard*, 531 N.E.2d 1358, 1369 (Ill. 1988) ("[W]here a plaintiff's injury results from the same risk, the existence of which required the exercise of greater care, unforeseeability of what exactly could develop and the extent of the injury or loss will not limit liability."). Illinois courts can and have applied that rule to find foreseeable harms disproportionate to more predictable harms.

In *Platson*, for example, an employee assaulted an intern—he grabbed her, pulled her to the floor, and forced himself on top of her before she escaped. The complaint alleged that the employer knew its employee "would rub and massage plaintiff's shoulders and intentionally brush his body against hers." 748 N.E.2d at 1282, 1284. The court reversed dismissal of the complaint.

And in *Rowe*, the court determined that the plaintiff's evidence presented a genuine issue of material fact: the landlord in that case knew that master keys to the property were missing and that burglaries without forced entry had been committed. 531 N.E.2d at 1369. Based on that knowledge, an ex-employee obtaining a key, entering the property, and shooting two people—killing one—was foreseeable. *Id.* at 1360, 1369. The magnitude of the harm Cooper inflicted on Alisha does not by itself render the harm unforeseeable.

We are left with the question whether "some harm" was foreseeable to a person of ordinary prudence. The district

court said that as a matter of law the answer is no. In review-
ing that decision, we reiterate that this is a question of fact;
judgment calls made from the perspective of ordinary, pru-
dent people are jury questions. We are therefore skeptical at
the outset of the district court's effort to resolve this point as
a matter of law. We ultimately disagree with and reverse that
decision. If the plaintiff can prove her allegations at trial, a
reasonable jury could find that "some harm" was foreseea-
ble.[5]

The plaintiff's amended complaint is unusually detailed—
much more detailed than required by Federal Rule of Civil
Procedure 8.[6] The amended complaint recounts how Cooper's
behavior escalated: from private inappropriate comments and
touching, to workplace retaliation, to continual harassment
and monitoring, and finally to public outbursts, verbal abuse,

---

[5] The district court appears to have believed the issue was a question of
law. That view is understandable. Reasonable foreseeability must be
proved as a matter of fact on a claim to recover for negligent hiring, su-
pervision, or retention, but reasonable foreseeability is one of the factors
in deciding whether a defendant has a duty to a plaintiff, and duty is
treated as a question of law. See *Simpkins*, 965 N.E.2d at 1096–97. Some of
the plaintiff's theories of recovery, and the defendants' responses, re-
quired considering the latter question. But the plaintiff's theory of negli-
gent hiring, supervision, or retention does not. An employer's duty to ex-
ercise reasonable care to control his employee under certain conditions is
well-established in Illinois law. See, e.g., *Kigin*, 541 N.E.2d at 736 ("Even
when an employee is acting outside the scope of his employment, his em-
ployer may still have a duty to exercise reasonable care to control him …
under certain conditions.").

[6] Detailed complaints have become a prudent course for plaintiffs, how-
ever, given the range of ways in which federal courts apply the new plead-
ing standards imposed under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). See *Run-
nion*, 786 F.3d at 520.

and physical intimidation. Hearing such evidence, a reasonable jury could easily find that the employers could and should have foreseen that Cooper would take the small further step to violence.

The defendants and the district court emphasize that Cooper never made explicit threats and never physically harmed anyone before his fatal attack on Alisha. The district court's opinion all but requires such a history to support an inference of reasonable foreseeability. See *Anicich*, 2016 WL 930655, at *5 ("[T]here are no allegations of a prior pattern of violence from which it can be inferred that Cooper's attack was reasonably foreseeable to defendants."). We find no support in Illinois law for such a bright-line rule on this issue of fact. Cf. *Platson*, 748 N.E.2d at 1286 (employee's assault on plaintiff was foreseeable where employer knew plaintiff was the "object" of "inappropriate physical advances").

The defendants' argument also assumes that none of Cooper's alleged behavior was implicitly threatening. That is incorrect. Anyone who saw Cooper, for example, "throwing and slamming items in the garden center and … parking lot while screaming obscenities," Am. Compl. ¶ 39, could have easily concluded that Cooper either was dangerous because he had lost control of himself or was trying to frighten Alisha.[7]

---

[7] In what might be described generously as excessive zeal by advocates, Grand's brief minimizes Cooper's behavior as "rude" and "mean to inanimate objects," Grand Br. 22, and even characterizes Cooper's final and fatal trip with Alisha as a "date." *Id*. at 17. Home Depot told the district court that Cooper had "made a few mistakes." See *Anicich*, 2016 WL 930655, at *4 n.5.

Every life lost to brutality is unique, each family's hell a private one. We do not diminish that truth when we repeat that Alisha's story is an old story that has been told too many times.[8] Its ending is both shocking and predictable. Alisha's family is entitled to try to prove its truth.

---

[8] See *Sabric v. Martin*, No. 3:09-2237, 2012 WL 1952197 (M.D. Penn. May 30, 2012) (woman murdered by co-worker who previously harassed, intimidated, isolated, stalked, belittled, and tried to control her); *People v. Farley*, 210 P.3d 361 (Cal. 2009) (defendant became obsessed with co-worker, and stalked, harassed, and threatened her for years; after she obtained a TRO, he shot eleven co-workers, including her, killing seven of them); *In re Civil Commitment of Martin*, 661 N.W.2d 632 (Minn. App. 2003) (man who propositioned woman, verbally abused her, showed up to her workplace, and twice broke into her family's home apprehended while plotting to kill her); *Carnes v. Tremco Mfg. Co.*, 30 S.W.3d 172 (Ky. 2000) (woman harassed then murdered by a co-worker); *Catlett v. State*, 962 S.W.2d 313 (Ark. 1998) (woman killed following months of harassment by defendant, who repeatedly called her home and workplace, drove up and down her street, and left graffiti near her home and workplace calling her a "bitch"); *State v. Zanter*, 535 N.W.2d 624 (Minn. 1995) (woman sexually assaulted and bludgeoned to death after being harassed at work for more than a year); *State v. Walsh*, 495 N.W.2d 602 (Minn. 1993) (woman murdered by coworker after receiving harassing phone calls from him for several months and repeatedly discovering him on her property uninvited); *State v. Landin*, 472 N.W.2d 854 (Minn. 1991) (woman killed by co-worker whose romantic advances she rebuffed, following a campaign of harassment and threats; murderer punched a door at work, dented victim's locker, set off firecrackers near her home, made prank phone calls, and left threatening notes); *State v. Apanovitch*, No. 49772, 1986 WL 9503 (Ohio App. 1986) (woman raped and murdered by painter she had hired who made numerous advances on her, showed up at odd times, and called her a "nice piece of ass").

For these reasons, we REVERSE the judgment of the district court in favor of defendants and REMAND for further proceedings consistent with this opinion.

---

According to the Bureau of Labor Statistics, around sixty people per year have been intentionally and fatally injured by their co-workers in recent years. Create Customized Tables, *Bureau of Labor Statistics*, https://data.bls.gov/cgi-bin/dsrv?fw (search "All U.S."; "Fatalities by primary source of injury"; "Event or exposure—Homicides (Intentional injury by other person)"; and "Co-worker or work associate of injured or ill worker") (last visited Mar. 21, 2017). Those numbers likely understate cases like Alisha's because they include only victims engaged in legal work activities at the time of the killings. Bureau of Labor Statistics, *Chapter 9: Occupational Safety and Health Statistics*, Handbook of Methods 16, https://www.bls.gov/opub/hom/pdf/homch9.pdf.